## CRIMINAL COMPLAINT

# United States District Court

**DISTRICT**
Eastern District of Pennsylvania

| UNITED STATES OF AMERICA<br>v.<br><br>Bassem Kuran<br><br>FILED<br>MAR 1 4 2016<br>MICHAEL E. KUNZ, Clerk<br>By _____ Dep. Clerk | DOCKET NO.<br>16-322 |
|---|---|
| | MAGISTRATE'S CASE NO. |

Complaint for violation of Title 18, United States Code, Section 1035

| NAME OF JUDGE OR MAGISTRATE<br><br>Honorable Carol Sandra Moore Wells | OFFICIAL TITLE<br><br>U.S. Magistrate Judge | LOCATION<br><br>Philadelphia, PA |
|---|---|---|
| DATE OF OFFENSE<br>January 30, February 3,<br>February 17, and March 2,<br>2012 | PLACE OF OFFENSE<br>Philadelphia PA | ADDRESS OF ACCUSED (if known) |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

1, 2.     On or about January 30 and February 3, 2012, at Philadelphia, in the Eastern District of Pennsylvania, the defendant, BASSEM KURAN, in a matter involving a health care benefit program, that is, Medicare, knowingly and willfully falsified, concealed and covered up, and aided and abetted the falsification, concealment and covering up, by trick, scheme and device, a material fact in connection with the delivery of and payment for health care benefits and services, in that the defendant created and caused to be created false documents, that is, "trip sheets" for ambulance transportation allegedly provided to Medicare beneficiary C.B. on January 30 and February 3, 2012, when, in fact, those ambulance transports were not provided, in violation of Title 18, United States Code, Sections 1035 and 2.

3, 4.     On or about February 17 and March 2, 2012, at Philadelphia, Philadelphia, in the Eastern District of Pennsylvania, the defendant, BASSEM KURAN, in a matter involving a health care benefit program, that is, Medicare, knowingly and willfully falsified, concealed and covered up, and aided and abetted the falsification, concealment and covering up, by trick, scheme and device, a material fact in connection with the delivery of and payment for health care benefits and services, in that the defendant created and caused to be created false documents, that is "trip sheets" for ambulance transportation allegedly provided to Medicare beneficiary L.B. on February 17, 2012 and March 2, 2012, when, in fact, those ambulance transports were not provided, in violation of Title 18, United States Code, Sections 1035 and 2.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

SEE AFFIDAVIT ATTACHED HERETO.

MATERIAL WITNESSES IN RELATION AGAINST THE ACCUSED:

| Being duly sworn, I declare that the foregoing is<br>true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT (official title)<br>Chuan Ngo |
|---|---|
| | OFFICIAL TITLE<br>Special Agent, Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence.

| SIGNATURE OF MAGISTRATE (1)<br><br>Honorable Carol Sandra Moore Wells, United States Magistrate Judge | DATE<br><br>March 14, 2016 |
|---|---|

1)  See Federal Rules of Criminal Procedure rules 3 and 54.

FILED

16-322

MAR 1 4 2016

MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

## AFFIDAVIT

I, Chuan T. Ngo, Special Agent, Federal Bureau of Investigation (FBI), being duly
sworn, state the following:

1.      I have been employed as a Special Agent (SA) with the FBI for approximately 18
and 1/2 years and am currently assigned to the Philadelphia Division. Since July of 2011, I have
been assigned to the Health Care Fraud squad. Prior to my employment at the FBI, I was a
county detective for the Camden County Prosecutor's Office for approximately 3 and 1/2 years
where I was assigned to the Major Crimes Unit and investigated health care violations. Before
reporting to the Philadelphia Division of the FBI, I trained for 16 weeks at the FBI Academy in
Quantico, Virginia. My FBI duties have included the investigation of health care fraud and
counterintelligence, field intelligence, and special operations matters.

2.      I hold a Mathematics Bachelor of Arts degree from Cornell University and a
Master in Public Policy degree from Princeton University.

## PURPOSE OF AFFIDAVIT

3.      The FBI, the United States Department of Health and Human Services, Office of
the Inspector General (HHS-OIG) and the United States Department of Labor, Office of
Inspector General (DOL-OIG) are participating in a joint investigation of VIP Ambulance (VIP)
and the activities of its owner, BASSEM KURAN (hereinafter BASSEM, to differentiate him
from co-conspirators with the same last name, KURAN), date of birth 10/28/1992, and others
involved with BASSEM in making false statements relating to health care matters, in violation of
Title 18, United States Code, Section 1035. As explained below, there is probable cause to

1

believe that VIP fraudulently billed Medicare for dialysis transports that were not provided and

that BASSEM falsely signed trip sheets knowing that ambulance transports were not provided, in

violation of Title 18, United States Code, Section 1035 (False Statements Relating to Health

Care Matters).

      4.     I submit this affidavit in support of an application for an arrest warrant for

BASSEM. The facts in this affidavit come from my personal observations, documents from

VIP, admissions by BASSEM, information obtained from other agents and witnesses, and my

training and experience. Because this affidavit is submitted for the limited purpose of

establishing probable cause to arrest BASSEM, this affidavit does not set forth each and every

fact learned by me or other agents during the course of this investigation.

      5.     In my training and experience, I have learned that ambulance companies that bill

Medicare for ambulance transportation record the transports on documents called "trip sheets" or

"run sheets" that are used to justify the billing. A trip sheet documents, among other things, the

patient's personal information, the patient's medical condition, and the medical care provided to

the patient during transport. If Medicare or its contractors perform an audit, trip sheets are

reviewed to determine whether the transportations are justified and what reimbursement is

appropriate for them. Each trip sheet is signed by the two professionals required by

Pennsylvania law to be present, that is, an Emergency Medical Technician (EMT), who also

affixes his/her unique Pennsylvania certification number, and the driver, who is required to be

trained in advanced first aid and emergency vehicle operations.

6.      In my training and experience, one way that ambulance companies fraudulently bill Medicare is by inventing ambulance trips that did not occur, that is, they bill Medicare as though ambulance rides were provided when in fact they were not.

7.      As described in greater detail below, BASSEM created and caused to be created false "trip sheets" for ambulance transportations provided to patients that concealed and falsely described that the patients were transported by ambulance to dialysis when, in fact, the individuals did not receive dialysis or could not have been transported as documented.  During all times relevant hereto, BASSEM was over the age of 18.

## THE MEDICARE PROGRAM

8.      Medicare is a federal health insurance program administered by the Centers for Medicare and Medicaid Services (CMS), an agency of the U.S. Department of Health and Human Services.  Medicare helps pay for the reasonable and medically necessary medical services for people aged 65 and older and some persons under 65 who are blind or disabled. Medicare is divided into several parts, including Part B, which covers, among other things, outpatient services.

9.      Under Medicare Part B, payment is made to providers of outpatient services, including medical transportation providers.  Medicare beneficiaries pay a monthly premium for Medicare Part B.

10.      CMS contracts with private insurance companies under Part B to receive, adjudicate, and pay Medicare claims submitted by participating health care providers and suppliers.  These private insurance companies are known as Medicare Administrative

3

Contractors (MACs). In the Commonwealth of Pennsylvania, CMS contracts with Highmark to be the MAC to process and pay Medicare Part B claims.

11.     The MAC, Highmark, also is required to process applications from medical providers seeking to enroll in the Medicare program.  Once the application is reviewed and approved, a provider is enrolled and issued a unique provider number.  The provider number must appear on all claims submitted by the provider to the carrier for payment.

12.     Upon enrollment, providers are issued a provider manual that generally describes the requirements to participate as a provider in the Medicare program.  Providers also periodically receive newsletters advising them of additional requirements for participation and instructions concerning which services are either covered or not covered by Medicare and the prerequisites for coverage.

13.     All providers and suppliers of Medicare Part B services are required to submit, within one year from the date of service, claims to the MACs on behalf of Medicare beneficiaries.  During this period, providers can file their Medicare Part B claims either electronically or in paper form.  Medicare reimbursement to providers is made by either an electronic funds transfer or a check payable to the provider and delivered by U.S. Mail.  For electronic funds transfer, providers must provide bank deposit information.

14.     As a condition of participation in the Medicare program, providers must agree to abide by the Medicare laws, regulations, and program instructions that apply to the provider. Providers must also certify their understanding that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions.  As a further condition of participation in the Medicare

program, providers must agree to submit to periodic audits by Medicare or its contractors. These audits are typically conducted with advance warning, and providers are often asked to submit documentation supporting the claims that they have made.

### A. INDICATIONS AND LIMITATIONS OF COVERAGE AND/OR MEDICAL NECESSITY

15. What follows is a summary of the Medicare rules governing ambulance transportation. The regulations identified and described below are only those most relevant to this affidavit, and there are many other regulations not material to this affidavit that are omitted.

16. Medicare covers ambulance services only if they are furnished to a beneficiary whose medical condition is such that other means of transportation are medically contraindicated (that is, other methods of transport would endanger the patient's health). Patients whose condition permits transport in any type of vehicle other than an ambulance do not qualify for ambulance services under Medicare. Thus, whether Medicare will reimburse or compensate a company for ambulance transportation depends on the patient's diagnosis, medical condition at the time of transport, and capacity to be transported by other means. To be deemed medically necessary for payment, and thus to be paid as a claim by Medicare, the patient must require both the transportation and the level of service provided.

17. The following indications and limitations of coverage and medical necessity statements derive from CMS national policy regarding coverage of ambulance services.

### B. MEDICAL NECESSITY

18. Ambulance service must be medically necessary and reasonable. Medical necessity is established for non-emergency ambulance services when the patient's condition is

5

such that the use of any other method of transportation such as taxi, private car, wheelchair van or other type of vehicle is contraindicated (that is, it would endanger the patient's medical condition). In any case in which some means of transportation other than an ambulance could be utilized without endangering the individual's health, whether or not such other transportation is actually available, no payment may be made by Medicare for ambulance service.

19. The patient's condition at the time of the transport is the determining factor in whether a trip will be covered. The fact that the patient is elderly, has a medical history, or cannot care for him/herself does not establish medical necessity. Claims may be denied if the use of the ambulance service is unreasonable for the illness or injury involved. Medicare will not pay for ambulance service when an ambulance was used simply for convenience or because another means of transportation was not available.

20. Reimbursement may be made for expenses incurred by a patient for ambulance services if, among other conditions, the patient was bed-confined before and after the ambulance trip or could be moved only by stretcher. CMS has defined bed-confinement as follows, and all three criteria must be met by the patient: (1) unable to get up from bed without assistance; (2) unable to ambulate; and (3) unable to sit in a chair or wheelchair. As defined, the term bed-confined is not synonymous with "bed rest" or "non-ambulatory." In addition, bed-confinement is not meant to be the sole criterion to be used in determining medical necessity. It is one factor to be considered when making medical necessity determinations. Medicare's current policy is that bed-confinement, by itself, is neither sufficient nor is it necessary to determine the coverage for Medicare ambulance benefits.

6

21.     Therefore, the current regulations provide that Medicare does not cover non-emergency ambulance transportation of patients who are restricted to bed rest by a physician's instructions, but who do not meet the above three criteria.  If some means of transportation other than an ambulance (*e.g.*, private car, wheelchair van) could be utilized without endangering the individual's health, whether or not such other transportation is actually available, no payment may be made for ambulance service.

## C.     PHYSICIAN CERTIFICATION

22.     Medicare requires ambulance providers to obtain a physician's written order certifying the need for an ambulance for scheduled and unscheduled non-emergency transports. A physician's order is referred to as a Certificate of Medical Necessity ("CMN").

23.     Under Medicare reimbursement guidelines, the CMN is necessary, but it is not sufficient.  The mere presence of the signed physician certification statement does not, by itself, demonstrate that the transport was medically necessary and does not absolve the ambulance provider from meeting all other coverage and documentation criteria.

24.     A scheduled non-emergency transport is a service requested 24 or more hours in advance of the transportation.  The physician's certification must be dated no more than 60 days prior to the date that the transportation service is provided.  For non-emergency ambulance services that are unscheduled or scheduled but non-repetitive, in lieu of the physician's signature, it is acceptable to obtain signed certification statements when professional services are furnished by physician assistants (PAs), nurse practitioners (NPs), registered nurse, or clinical nurse specialist (CNS) (where all applicable State licensure or certification requirements are met).

25.     An unscheduled non-emergency transport is a service that is requested less than 24 hours in advance of the required transportation.  For unscheduled non-emergency transports occurring on and after January 31, 2000, ambulance suppliers must follow the procedures described below:

a.      Before submitting a claim, ambulance suppliers must obtain a signed certification statement from the attending physician.  If the ambulance supplier is unable to obtain the signed certification statement from the attending physician, a signed physician certification statement must be obtained from either the PA, NP, CNS, RN, or discharge planner who has personal knowledge of the beneficiary's condition at the time that the ambulance transport is ordered or the service is furnished.  This individual must be employed by the beneficiary's attending physician or by the hospital or facility where the beneficiary is being treated and from which the beneficiary is transported.

b.      Alternatively, for non-emergency ambulance services that are either unscheduled or scheduled on a non-repetitive basis, providers must obtain a written order from the beneficiary's attending physician, within 48 hours after the transport.  If unable to obtain the physician's written order within 48 hours, providers may submit a claim for the service if a PCS or certification from an acceptable alternative person has been obtained, or after 21 days if acceptable documentation of attempts to obtain the certification has been obtained.

8

26.    In all cases, the appropriate documentation must be maintained on file and, upon request, be presented to Medicare or its representatives.  The ambulance service must meet and be able to present documentation for all other coverage criteria in order for payment to be made.

**D.     PHYSICIAN MEDICAL NECESSITY CERTIFICATION AND PHYSICIAN CERTIFICATION STATEMENT REQUIREMENTS FOR REPETITIVE AMBULANCE SERVICES**

27.    According to a July 25, 2003, CMS memorandum, a repetitive ambulance service is defined as medically necessary ambulance transportation that is furnished three or more times during a 10-day period or at least once per week for at least three weeks.  Dialysis and respiratory therapy are types of treatments for which repetitive ambulance services are often necessary.  However, the requirement for submitting the PCS form for repetitive, scheduled, non-emergency ambulance services is based on the quantitative standard (three or more times during a ten-day period or at least once per week for at least three weeks).  Similarly, regularly scheduled ambulance services for follow-up visits, whether routine or unexpected, are not repetitive for purposes of this requirement unless one of the quantitative standards is met.

28.    CMS regulations set forth information about the responsibility of the ambulance supplier to maintain, and to furnish on demand, complete and accurate documentation of the beneficiary's condition to demonstrate the ambulance service met the medical necessity criteria.

**BACKGROUND OF INVESTIGATION**

29.    BASSEM and others have been the subjects of an investigation by FBI, HHS-OIG and DOL-OIG into ambulance fraud committed by VIP and its predecessor sister company, Brotherly Love Ambulance (Brotherly Love).  Brotherly Love was owned and operated by BASSEM's mother, Feda Kuran, and BASSEM's older brother, Thael Kuran.  In 2013, Feda

9

Kuran pleaded guilty to health care fraud and aiding and abetting health care fraud, based on her role in the Brotherly Love fraud; on November 5, 2014, the Honorable William H. Yohn sentenced Feda Kuran to a term of 64 months in prison in Criminal No. 13-00160. In fall 2015, Thael Kuran pleaded guilty to conspiracy to commit health care fraud and making false statements in health care matters for his role in both the Brotherly Love and VIP frauds; on February 23, 2016, The Honorable Gerald J. Pappert sentenced Thael Kuran to a term of 37 months in prison in Criminal No. 14-0596-02. In explaining his sentence for Thael Kuran, Judge Pappert referenced the continuation of the Brotherly Love fraud at VIP as one basis for sentencing Thael Kuran to a term at the top of Thael Kuran's advisory Sentencing Guideline range.

30.     Six other employees or patients of Brotherly Love have also pleaded guilty to various charges including health care fraud conspiracy, violations of the anti-kickback statute, and making false statements.

31.     BASSEM was employed by Brotherly Love for nearly a year before it ceased operations following execution of a federal search warrant on October 4, 2011. Only ten days later, through BASSEM, its owner and president, VIP applied to Medicare to become a Medicare provider of ambulance services; VIP received its license to operate on December 21, 2011, less than three months after the search of the offices of Brotherly Love.

32.     According to claims that VIP Ambulance submitted to Medicare, VIP provided its first service to a Medicare beneficiary on January 23, 2012, and VIP's final service to a Medicare beneficiary took place on July 26, 2013. Among the beneficiaries purportedly transported by

VIP were several former patients of Brotherly Love, including individuals who are identified by their initials below.

33. During the approximately 18 months that VIP was in operation, VIP billed Medicare Part B for $919,989.38. VIP was paid $537,715.44 by Medicare.

34. BASSEM was VIP's registered owner. BASSEM was listed as the Contact Person in Section 13 of VIP's application to Medicare, and in Section 15 of that application, BASSEM was listed as VIP's President. BASSEM was the only authorized official signature in this application, and he was the sole Delegated Official in the application.

35. BASSEM was the authorized signatory on the checking account held by VIP, and he wrote numerous checks on behalf of VIP, including to pay its business expenses and employee compensation. BASSEM also signed the portion of the Medicare application that included the Electronic Funds Transfer Authorization Agreement, by which VIP agreed to accept funds from Medicare electronically.

## AUDIT

36. During 2013, the Centers for Medicare and Medicaid Services (CMS)'s Safeguard Services (SGS) contractor made several attempts to audit VIP. SGS attempted on-site visits with VIP on June 25, 2013, July 17, 2013, October 17, 2013, and finally on November 8, 2013. At the November 8, 2013 meeting, at the request of SGS personnel, BASSEM turned over VIP trip sheets to SGS for its review and audit. SGS then provided these trip sheets to HHS-OIG after HHS-OIG submitted a Request for Information (RFI) to SGS relating to them.

## INVESTIGATION

37.     Analysis of the VIP trip sheets that VIP provided to SGS shows information in them that is internally contradictory and other information that is demonstrably false. Several non-exclusive examples are provided below.

38.     One beneficiary, C.B., received a kidney transplant on January 17, 2012 and had no further need for dialysis transports after a brief period while the transplant became effective. The records from C.B.'s dialysis center show that C.B. received dialysis only twice after January 17, 2012. Those sessions occurred on January 25, 2012 and January 27, 2012. C.B. stated to your affiant that he did not receive dialysis at any time after January 27, 2012 and did not receive dialysis at a facility other than that from which his records were obtained.

39.     Nonetheless, VIP continued to bill Medicare for transportation of C.B. to and from dialysis, including on January 30, 2012, February 3, 2012, and February 6, 2012. The February 3, 2012 and February 6, 2012 trip sheets from C.B.'s dialysis clinic to C.B.'s residence were personally signed by BASSEM. As described in greater detail below, BASSEM admitted to your affiant that he signed the February 6, 2012 trip sheet, and the signature on the February 3, 2012 trip sheet is similar. In addition, each of these trip sheets was submitted by BASSEM on behalf of VIP in response to the SGS audit.

40.     C.B. was formerly a patient at Brotherly Love; C.B. has previously acknowledged that he did not need ambulance transportation and often drove himself and other patients to dialysis in his personal vehicle but permitted Brotherly Love to bill those (car) transports as if they were ambulance runs.

12

41.     Another beneficiary, L.B., stated to your Affiant and an HHS-OIG agent that at no time did he ever ride a VIP ambulance. L.B. stated that during the period in question, he rode a SEPTA bus to and from treatment. VIP submitted numerous bills for alleged transports of L.B. Like C.B., L.B. was a former patient of Brotherly Love; L.B. was one of the individuals who was transported to and from dialysis by C.B. in C.B.'s personal vehicle during the time that Brotherly Love was billing for his transportation.

42.     For February 3, 2012, the records that BASSEM provided to SGS on behalf of VIP show BASSEM signing trip sheets for the transport of L.B. and C.B. with an EMT, A.A. The documentation signed by BASSEM is inconsistent. For example, BASSEM attests to having transported C.B. home from dialysis with A.A. from 20:03 until 20:23 (i.e. 8:03 p.m. until 8:23 p.m.), but BASSEM separately attests to having transported L.B. home from dialysis with A.A. from 19:47 until 20:05. Both patients are reported to have been strapped onto the stretcher in the ambulance, but ambulances like those operated by VIP can only hold one patient in a stretcher at a time.

43.     These are representative of the many inconsistencies in the records of VIP Ambulance. The records of three patients – C.B., L.B., and J.A., all former clients of Brotherly Love – show a number of impossibilities and inconsistencies, as summarized on the tables that follow. The issue annotations below are as follows:

a.     "Two Places at Once" means that BASSEM signed separate trip sheets attesting that he was personally transporting different patients at the same time. As the trip sheets indicate that the beneficiaries were being transported on stretchers, and the VIP Ambulances held only one stretcher, this is impossible.

13

b.     "Impossible Times" means that BASSEM signed trip sheets that have the patient being transported before the patient has concluded dialysis or had the patient being transported to dialysis at times that the dialysis clinic's records indicate that the patient was already receiving dialysis.  For example, on February 1, 2012, the records BASSEM provided to SGS on behalf of VIP indicate that BASSEM and A.A. transported patient L.B. (who, again, has told law enforcement he never rode in a VIP ambulance) home starting at 19:41.  But the records of L.B.'s dialysis treatment show that L.B. was in the dialysis chair until 20:19, nearly forty minutes later and approximately twenty minutes after BASSEM attests to having dropped L.B. off at L.B.'s home.

c.     "No Dialysis" indicates that BASSEM signed trip sheets and VIP billed Medicare for transportation to and from dialysis on a day that the dialysis clinic's records show that the patient did not receive dialysis at all.  For example, VIP billed and was paid by Medicare for transporting patient L.B. to dialysis on February 17, 2012.  BASSEM signed a trip sheet attesting to this transport, which BASSEM provided to SGS on behalf of VIP.  But the records of L.B.'s dialysis center show that L.B. did not receive dialysis on that day.

44.     The following tables detail a few of the fraudulent ambulance transports of patients L.B., J.A. (another former Brotherly Love patient), and C.B. during the course of VIP's operation.  They are a representative, not comprehensive, list of the fraudulent transports.

**PATIENT: L.B.**

| Date | Trip Dest. | On Chair | Off Chair | Trans Start | Trans End | Crew | Issue |
|------|-----------|----------|-----------|-------------|-----------|------|-------|
| 02/01/2012 | Residence | 1613 hrs | 2019 hrs | 1941 hrs | 1958 hrs | B Kuran A.A. | Impossible Times |
| 02/03/2012 | Residence | 1635 hrs | 1938 hrs | 1947 hrs | 2003 hrs | B Kuran A.A. | 2 Places at Once |
| 02/06/2012 | Dialysis | No Dialysis | No Dialysis | 1511 hrs | 1520 hrs | B Kuran A.A. | No Dialysis |
| 02/08/2012 | Residence | 1712 hrs | 2038 hrs | 1947 hrs | 2009 hrs | B Kuran A.A. | Impossible Time |
| 02/17/2012 | Dialysis | No Dialysis | No Dialysis | 1511 hrs | 1522 hrs | B Kuran A.A. | No Dialysis |
| 02/24/2012 | Residence | 1628 hrs | 1952 hrs | 1941 hrs | 2001 hrs | B Kuran A.A. | Impossible Time |
| 02/29/2012 | Residence | 1551 hrs | 1952 hrs | 1946 hrs | 2006 hrs | B Kuran A.A. | Impossible Time |
| 03/02/2012 | Residence | No Dialysis | No Dialysis | 1946 hrs | 2004 hrs | B Kuran A.A. | No Dialysis |
| 03/05/2012 | Residence | 1634 hrs | 2029 hrs | 1946 hrs | 2004 hrs | B Kuran A.A. | Impossible Time |
| 03/09/2012 | Residence | 1605 hrs | 1926 hrs | 1936 hrs | 1951 hrs | B Kuran | Impossible |

| | | | | | | A.A. | Time |
|---|---|---|---|---|---|---|---|
| 03/12/2012 | Residence | 1526 hrs | 1907 hrs | 2003 hrs | 2018 hrs | B Kuran A.A. | 2 Places at Once |
| 03/30/2012 | Residence | 1616 hrs | 2005 hrs | 1947 hrs | 2009 hrs | T Kuran A.A. | 2 Places at Once |
| 04/02/2012 | Residence | 1559 hrs | 1959 hrs | 1952 hrs | 2014 hrs | T Kuran A.A. | 2 Places at Once |
| 04/09/2012 | Residence | No Dialysis | No Dialysis | 1946 hrs | 2007 hrs | T Kuran A.A. | No Dialysis |

**PATIENT: J.A.**

| Date | Trip Dest | On Chair | Off Chair | Trans Start | Trans End | Crew | Issue |
|---|---|---|---|---|---|---|---|
| 02/03/2012 | Residence | 1631 hrs | 1945 hrs | 2016 hrs | 2029 hrs | T Kuran A.A. | 2 Places at Once |
| 02/06/2012 | Residence | 1614 hrs | 1903 hrs | 2001 hrs | 2011 hrs | T Kuran A.A. | 2 Places at Once |
| 2/27/2012 | Dialysis | 1130 hrs | 1445 hrs | 1604 hrs | 1613 hrs | B Kuran A.A. | Impossible Time |
| 03/12/2012 | Residence | 1615 hrs | 1933 hrs | 2001 hrs | 2012 hrs | B Kuran A.A. | 2 Places at Once |
| 03/30/2012 | Dialysis | 1135 hrs | 1453 hrs | 1946 hrs | 1957 hrs | B Kuran | 2 Places at |

16

| | | | | | | A.A. | Once |
|---|---|---|---|---|---|---|---|
| 03/30/2012 | Residence | 1135 hrs | 1453 hrs | 1950 hrs | 2001 hrs | B Kuran A.A. | 2 Places at Once |
| 04/02/2012 | Dialysis | 1610 hrs | 1927 hrs | 1941 hrs | 1952 hrs | B Kuran A.A. | 2 Places at Once |
| 04/02/2012 | Residence | 1610 hrs | 1927 hrs | 1956 hrs | 2007 hrs | T Kuran A.A. | 2 Places at Once |

**PATIENT: C.B.**

| Date | Trip Dest | On Chair | Off Chair | Trans Start | Trans End | Crew | Issue |
|---|---|---|---|---|---|---|---|
| 1/30/2012 | Residence | No Dialysis | No Dialysis | 2002 hrs | 2022 hrs | B Kuran A.A. | 2 Places at Once No Dialysis |
| 02/03/2012 | Residence | No Dialysis | No Dialysis | 2003 hrs | 2019 hrs | B Kuran A.A. | 2 Places at Once No dialysis |
| 02/05/2012 | Residence | No Dialysis | No Dialysis | 1947 hrs | 2003 hrs | B Kuran A.A. | No Dialysis |
| 02/06/2012 | Residence | No | No | 2001 hrs | 2019 hrs | B Kuran | 2 Places |

| | | Dialysis | Dialysis | | | A.A. | at Once No dialysis |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

45.     In numerous additional instances, BASSEM signed trip sheets that were inconsistent with other trip sheets that he submitted on behalf of VIP to Medicare.  For example, there are multiple occasions on which BASSEM signed a trip sheet in which he claimed that he was performing an ambulance run with A.A. and in which BASSEM's brother, Thael Kuran., attested to performing an ambulance run with A.A. at the same time.

46.     On multiple occasions, including but not limited to on trip sheets in the charts above, BASSEM signed and submitted trip sheets to Medicare representing that he transported patient J.A. with EMT A.A.  On more than a dozen of these trip sheets, A.A.'s name was misspelled on the "printed name" and "signature" sections of the run sheet, demonstrating that A.A. did not, in fact, sign these sheets.  At least five of these occasions were also impossible runs in which VIP reported transporting J.A. to dialysis in the evening when in fact her dialysis had already occurred earlier in the day.

47.     BASSEM also signed trip sheets for an additional four or more days on which he claimed to have transported J.A. in the evening when she had already had dialysis in the morning or early afternoon.

48.     At least four trip sheets submitted by BASSEM to SGS on behalf of VIP represented that the transport of patient J.A. had been performed by an EMT, M.B., and a female VIP employee, M.C.  M.B. has informed your affiant that he never transported J.A. and never

18

transported any patient with M.C.  J.A. has informed your affiant that she was never transported by a female.

49.     The amount billed by VIP to Medicare for the specific, identified fraudulent "transports" listed in the charts above was in excess of $7000, and the amount paid by CMS was in excess of $3500.  The total amount paid by Medicare for purported transport of patients J.A., C.B., and L.B. alone was in excess of $65,000.

50.     During the dates and times identified above, BASSEM remained the owner and President of VIP Ambulance.

### INTERVIEWS OF BASSEM

51.     On November 4, 2014, during the arrest of BASSEM's brother Thael Kuran in connection with the Brotherly Love health care fraud, BASSEM was present and told agents, "I thought you were here for me, why are you arresting my brother? If you are arresting someone for that it should be me." BASSEM further stated, "What my mother did and I did, we did.  My brother had nothing to do with it...we were in high school when my mom began this.  You should arrest me not him."

52.     On March 25, 2015, your affiant and an agent from HHS-OIG served a grand jury subpoena for documents on BASSEM and interviewed BASSEM outside his residence. BASSEM related that he had been employed by Brotherly Love as an ambulance driver and further, that he had been the owner of VIP.  BASSEM admitted that he received his certification as an ambulance driver from his mother and not through proper training and licensing. BASSEM stated that he did what he saw others do in the ambulance community.  BASSEM admitted that, while employed at Brotherly Love, BASSEM, Thael Kuran, and another Brotherly

Love employee, F.B., transported 20 patients to and from dialysis in personal vehicles. When shown two VIP trip sheets for beneficiaries C.B. and J.A., both dated February 6, 2012, BASSEM confirmed that the signature on C.B.'s trip sheet was his signature. BASSEM could not offer an explanation why the two trip sheets stated that the same ambulance was in two locations carrying two different beneficiaries, at the same time, on the same day. BASSEM acknowledged that on behalf of VIP, he had received Medicare's request for the trip sheets in connection with the VIP audit. BASSEM admitted that he sent the VIP trip sheets to Medicare, then received them back, after the audit.

## **CONCLUSION**

53.    BASSEM's admissions, when reviewed in conjunction with witness statements and the false trip sheets listed above, show that BASSEM made false statements on trip sheets that were retained to support billing in health care matters and were submitted in response to Medicare audit requests.

54.    Based on the information above, your affiant respectfully submits that there is probable cause to believe that BASSEM has violated 18 U.S.C. § 1035.  Accordingly, your affiant respectfully requests that this Court issue a warrant to arrest BASSEM KURAN for violations of Title 18, United States Code, Section 1035.


CHUAN T. NGO
Special Agent
Federal Bureau of Investigation


SWORN AND SUBSCRIBED
BEFORE ME this 14th
day of March , 2016


CAROL SANDRA MOORE WELLS
United States Magistrate Judge


21